# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JOHN BUSSE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 16 C 11084 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, John Busse, has filed a motion for summary judgment seeking reversal or remand of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying his claim for Social Security disability benefits (docs. #10: Pl.'s Mot. for Summ. J., #11: Mem. in Support). The Commissioner has filed a response asking the Court to affirm its decision (doc. #18: Def.'s Resp.). For the reasons that follow, we grant Mr. Busse's motion.

## I.

Mr. Busse applied for disability insurance benefits on May 30, 2013, alleging he became disabled on July 13, 2011 (R. 210, 212–18). His date last insured was December 31, 2017 (R. 19). Mr. Busse's claim was denied initially (R. 100–03), and again on reconsideration (R. 106–08). An Administrative Law Judge ("ALJ") held a hearing on July 14, 2015 (R. 61–69), but separated from the agency before rendering an opinion (R. 39). Another ALJ held a *de novo*

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2] On February 8, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 6).

hearing on February 25, 2016 (*Id.*). On April 21, 2016, the ALJ issued a written opinion finding Mr. Busse was not disabled from July 13, 2011 through the date of the decision (R. 16–30). The Appeals Council denied Mr. Busse's request for review, making the ALJ's determination the final decision of the Commissioner (R. 1–4, 14). 20 C.F.R. § 404.981; *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017).

## II.

Mr. Busse was born on November 23, 1958 and earned a high school diploma (R. 212, 265, 496). He began working for Caterpillar, Inc. in September 1988 (R. 337). Mr. Busse worked as a numerical control machine operator and set-up person through the end of his employment in 2011 (R. 55–56).[3] He was discharged from Caterpillar on July 13, 2011 for not meeting the expectations laid out in a May 9, 2011 Performance Improvement Plan (R. 376, 379).[4] Mr. Busse has not worked since his termination from Caterpillar (R. 42, 71, 351).

Mr. Busse's alleged onset date is the same date that his employment was terminated, July 13, 2011 (R. 212, 379). In his Disability Report, dated June 17, 2013, Mr. Busse wrote that he stopped working "[b]ecause of [his] condition(s)," which he identified as bipolar disorder, depression and anxiety (R. 264). In his August 20, 2013 Function Report, Mr. Busse stated that

---

[3] Mr. Busse testified at his February 25, 2016 hearing that he was a "programmer" (R. 55). His Performance Improvement Plans, dated September 28, 2010 and May 9, 2011, stated that Mr. Busse "came to Caterpillar as a Manufacturing Engineer responsible for Programming [on] May 31, 2009" (R. 373, 376). It is unclear from the record whether Mr. Busse held any other job titles while working for Caterpillar.

[4] The ALJ wrote that Mr. Busse testified under oath that he lost his job due to pace demands and that the record revealed he was fired after making threatening statements following a poor review (R. 25). We see no support in the record for either statement. In fact, the treatment record the ALJ cited as evidencing the reason for Mr. Busse's termination—in which Mr. Busse did discuss the angry and threatening comments he made at work with his treating psychiatrist—was dated nearly a year before Mr. Busse's termination, and there is no nexus in the record between that exchange and his later firing (R. 407). The supervisor's summary of Mr. Busse's termination mentions nothing about the earlier incident, and in fact states that Mr. Busse was terminated for poor performance in accordance with his Performance Improvement Plan from May 2011 (R. 376, 379). The plan mentions neither a pace requirement nor the previous heated exchange (R. 376).

he has been "under the care of multiple professionals in the 'mental health field' since 1994 and being on medication to treat depression, ADHD, bipolar disorder and anxiety for almost 20 years now has taken its toll on my mind" (R. 287). More specifically, Mr. Busse claimed he has "a very meager/poor 'short term memory'; [which] combined with [his] feeble concentration skills made it difficult for [him] to process tasks from start to finish in a single setting" (Id.). With regard to his social activities, Mr. Busse wrote that he had become "more of a recluse; staying home more to avoid confrontation and large groups of people" (R. 292). In addition, Mr. Busse noted that he "[has] problems" with authority figures and he takes "medication for anxiety to handle 'life,' I don't like stress and don't perform well under it" (R. 293). Finally, Mr. Busse explained that since losing his job, he has gained over 50 pounds and is "very self-aware of my larger size and don't like it at all" (R. 294).

While Mr. Busse's mental health history dates back to at least 1994, when he began medication and outpatient psychiatric treatment (R. 43, 287, 496), this Court will focus on those facts relevant to Mr. Busse's alleged disability beginning with his alleged onset date in July 2011. Mr. Busse has primarily been under the care of two doctors relevant to his claim: a psychiatrist, John Goldin-Mertdogan, M.D., as well as a psychologist, Timothy Buhrt, Psy.D. (R. 339).

### A.

Mr. Busse began treatment with Dr. Goldin-Mertdogan in July 2008 (R. 508). Mr. Busse saw Dr. Goldin-Mertdogan regularly, with at least 29 visits taking place after Mr. Busse's alleged onset date (R. 604–10). In late July 2011, Dr. Goldin-Mertdogan diagnosed Mr. Busse with bipolar affective disorder, attention deficit disorder with hyperactivity ("ADHD") and other personality disorders (R. 400). Dr. Goldin-Mertdogan also prescribed Abilify, Topamax,

Adderall and Lexapro during this visit (*Id.*). At a follow-up visit a month later, Dr. Goldin-Mertdogan discontinued Adderall, added Xanax and Vyvanse, and continued Mr. Busse's other medications (R. 399). The next month, Dr. Goldin-Mertdogan switched Mr. Busse from Vyvanse back to Adderall (R. 398). Dr. Goldin-Mertdogan maintained the same diagnoses and medications through mid-March 2012 (R. 395–97).

Dr. Goldin-Mertdogan's treatment records show a trend of waxing and waning symptoms documenting both positive and negative self-reports from Mr. Busse as well as positive and negative observations by the doctor. For example, on June 22, 2012, Dr. Goldin-Mertdogan noted signs of insomnia and depression, as well as a blunted affect, a mood of "35 to 40/100," and poor energy level and motivation (R. 394). Dr. Goldin-Mertdogan increased Mr. Busse's Lexapro dosage and refilled his remaining prescriptions (*Id.*). Mr. Busse's visits on July 19, 2012, September 13, 2012, November 15, 2012, March 8, 2013, and May 23, 2013 revealed positive observations, including an "improved mood" and "brighter and calmer affect" (R. 384–85, 389–92). Despite Dr. Goldin-Mertdogan's positive observations, Mr. Busse complained that he continued to have difficulty falling asleep (R. 384). Dr. Goldin-Mertdogan restated his initial diagnoses and prescribed Xanax and Ativan (*Id.*).

In his January 11, 2013 and March 1, 2013 treatment notes, Dr. Goldin-Mertdogan observed that Mr. Busse's mood had worsened (R. 386, 388). During their January meeting, Mr. Busse stated his "unemployment benefits were suddenly cut off a few weeks ago" and Dr. Goldin-Mertdogan advised him to apply for social security disability insurance through Medicare (R. 388). The following month, Mr. Busse reported that he had run out of prescription medications and could not afford many of them (R. 387). At their March 1, 2013 appointment, Mr. Busse continued to express that he was upset his unemployment benefits had been cut off

and Dr. Goldin-Mertdogan indicated that "[patient] assistance forms were completed and signed" (R. 386). In visits on August 8, 2013 and October 4, 2013, Dr. Goldin-Mertdogan observed increased anxiety, a worried, upset, and stressed-out mood, an "agitated and nervous" affect, and poor attention and concentration (R. 462–63). At the August visit, Dr. Goldin-Mertdogan prescribed Strattera, increased the Xanax prescription daily dosage, and continued Ativan (R. 463); in October, he increased the Strattera dosage and continued Ativan and Xanax (R. 462).

On March 10, 2014, Dr. Goldin-Mertdogan opined as part of a Non-Exertional Impairment Questionnaire that Mr. Busse was "unable to work due to [b]ipolar [and] ADHD" (R. 515). He also completed a Psychiatric/Psychological Impairment Questionnaire, diagnosing Mr. Busse with bipolar disorder and ADHD, and assigning a Global Assessment Functioning Score ("GAF") of 60 (R. 508).[5] He noted that Mr. Busse's lowest GAF score within that year was 40 (*Id.*). Dr. Goldin-Mertdogan listed symptoms including poor focus, inattention, labile mood swings, hopelessness, worthlessness, anxiety, fear, paranoia, irritability, anger, amotivation, and difficulty completing tasks as his "primary" symptoms (R. 509–10). The doctor further found that Mr. Busse was "markedly limited" in his "ability to set realistic goals or make plans independently" (R. 511), his impairments were ongoing (R. 512), and that he was "[i]ncapable of even 'low stress'" (*Id.*). Finally, Dr. Goldin-Mertdogan estimated that Mr. Busse

---

[5] GAF, or global assessment of functioning, is The Global Assessment of Functioning ("GAF") is a system used to score the severity of psychiatric illness, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3036670/ (last visited on September 14, 2016). A score of 40 represents "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." http://www.albany.edu/counseling_center/docs/GAF.pdf (visited on February 8, 2017). We note that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed.2013). *See Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing the discontinuation of use of the GAF scale after 2012).

would be absent from work more than three times per month as a result of these impairments (R. 513).

Several subsequent 2014 visits again yielded both positive and negative observations and self-reports. On March 14, 2014, Mr. Busse reported becoming increasingly tearful with depressed moods and feeling "extremely anxious over small things" (R. 460). Dr. Goldin-Mertdogan's observations at that visit, however, included "no insomnia, decreased anxiety, no depression . . . calmer mood, calmer and brighter affect . . . no tearfulness . . . [and] less frustrated moods;" but Dr. Goldin-Mertdogan noted that Mr. Busse also exhibited poor attention and concentration (*Id.*). On June 13, 2014, Mr. Busse reported that "his moods have been depressed lately" with passive suicidal thoughts, and Dr. Goldin-Mertdogan prescribed Adderall, Ativan, Xanax, Abilify, Celexa and Topamax (R. 502). On August 8, 2014, Mr. Busse reported that he felt it was "highly unlikely [he could] return to work because he has poor short term memory and forgets regular conversations with people," and he couldn't finish tasks such as mowing his lawn without distraction (R. 538). Dr. Goldin-Mertdogan also reported that Mr. Busse's "moods have been somewhat less depressed lately without any suicidal thoughts" (*Id.*).

On April 10, 2015, Mr. Busse stated that he felt a lack of motivation, and Dr. Goldin-Mertdogan increased his Adderall dosage (R. 543). On July 10, 2015, Mr. Busse reported his mood as anxious and his affect appeared "tense and constricted" (R. 545). Three days later, Dr. Goldin-Mertdogan completed a Mental Impairment Questionnaire in which he noted multiple symptoms, identifying as marked limitations Mr. Busse's ability to understand, remember, and carry out detailed instructions and perform activities within a schedule and consistently be punctual (R. 548–51). Additionally, he estimated that Mr. Busse was likely to be absent from work more than three times per month as a result of these impairments (R. 551). On October 8,

2015 and January 15, 2016, Dr. Goldin-Mertdogan described Mr. Busse's mood as "anxious and down," with a blunted affect, although his attitude was "cooperative and pleasant" (R. 597, 599).

**B.**

Dr. Buhrt began treating Mr. Busse at least as early as December 2008 (R. 517). Mr. Busse testified at his July 14, 2015 hearing that he saw Dr. Buhrt at least once a month, but closer to every week or two if his life was "in shambles" (R. 65, 604–10). On September 21, 2011, Dr. Buhrt observed Mr. Busse to be moderately depressed, worried, sad, deflated, annoyed, pessimistic and negative, diagnosing him with recurrent moderate major depressive disorder (R. 577). Dr. Buhrt's observations were identical in November 2011, but his June and July 2012 and January 2013 progress notes indicate that Mr. Busse had become severely depressed and moderately anxious (R. 573–76). On July 3, 2013, Dr. Buhrt observed that Mr. Busse's mood, energy, feelings of worthlessness or guilt, and ability to think or concentrate had worsened (R. 572). Mr. Busse reported his mood as depressed, his affect was "dysphoric," and his insight and judgment as compromised (*Id.*). That said, Dr. Buhrt described Mr. Busse as "cooperative, friendly, and engaging with good eye contact and normal attention, focus and activity levels" (*Id.*). Dr. Buhrt's progress notes reiterated these negative and positive observations through November 17, 2014, though one progress note described his mood as irritated rather than depressed (R. 562–71). On April 13, 2015, his mood was described as "irritated with affect as somewhat restricted and blunted, but context responsive" (R. 561).

On May 15, 2015, Dr. Buhrt completed a Mental Impairment Questionnaire in which he reiterated his diagnosis of major recurrent depressive disorder and also diagnosed Mr. Busse with ADHD (R. 517–21). He assigned Mr. Busse a GAF score of 50 (R. 517). Dr. Buhrt identified Mr. Busse's most frequent and/or severe symptoms as depressed mood, anhedonia, weight gain,

sleep difficulties, fatigue, feeling of worthlessness, and diminished ability to think or concentrate (R. 519). He further opined that Mr. Busse had marked limitations in his ability to remember locations and work-like procedures, understand and remember detailed instructions, maintain attention and concentration for extended periods, and perform activities within a schedule and consistently be punctual (R. 520). Finally, he estimated that Mr. Busse would be absent from work more than three times per month as a result of these impairments (R. 521).

On May 18, 2015, Mr. Busse described his mood as "O.K." (R. 558), yet from late June to late August 2015, Dr. Buhrt's progress notes continued to indicate Mr. Busse was depressed, sad, or irritated with a dysphoric or anxious affect (R. 553–57). In a letter addressed to Mr. Busse's counsel, dated September 27, 2015, Dr. Buhrt concluded:

> Given the numerous years Mr. Busse has struggled with fluctuating levels of depression, despair, anxiety, and agitation, he would be unable to maintain consistent employment . . . . Mr. Busse has worked diligently to address his physical and emotional difficulties through medication and outpatient counseling. Unfortunately, the level [of] psychological distress that Mr. Busse experiences on a daily basis inhibits him from participating in outside employment.

(R. 586, 588–89). Mr. Busse continued to visit Dr. Buhrt through September 14, 2016 and Dr. Buhrt usually found him to be depressed and/or irritated or angry (R. 590–92, 594, 602–03).

## C.

Mr. Busse saw two state agency psychologists as part of his claim for benefits; David NieKamp, Psy.D. and Glen Wurglitz, Psy.D. (R. 428–32, 495–99).

On August 14, 2013, Mr. Busse spent approximately 45 minutes with Dr. NieKamp (R. 428). Dr. NieKamp opined that Mr. Busse's "reported psychological symptoms and behavioral history appear to be commensurate with moderate to severe levels of depression and anxiety with PTSD features" and assigned a GAF score of 45 (R. 431). Thereafter, on April 17, 2014, Dr.

Wurglitz evaluated Mr. Busse and found that anxiety, mood instability, slow pace, and poor eye contact interfered with his social functioning (R. 495, 497). However, Dr. Wurglitz also stated that Mr. Busse appeared to have "no significant negative change in his level of functioning" (*Id.*). Dr. Wurglitz diagnosed him with bipolar disorder, ADHD and personality disorder, and assigned a GAF score of 65 (R. 498–99). He concluded that Mr. Busse might "benefit from a referral for outpatient psychiatric services such as psychotherapy" (R. 499).

A non-examining state agency psychologist, Dr. Glen Pittman, relied on the opinions of these two consultative physicians in his Disability Determination Explanation, issued on April 30, 2014 (R. 81–94). The report notes Mr. Busse's impairments, including affective disorders and anxiety disorders (R. 89). However, the report states that the objective medical evidence does not support Mr. Busse's claims as to the "intensity, persistence, and functionally limiting effects of the symptoms" (R. 90). Dr. Pittman's report additionally notes varying levels of limitation—from none to moderate—in different aspects of his Residual Functional Capacity ("RFC") (R. 91–92). The report's final determination was that Mr. Busse was not disabled (R. 94).

### D.

At his hearing on February 25, 2016, Mr. Busse testified that he struggles with short-term memory and concentration (R. 43). He stated that he had difficulty completing menial tasks around his house and does not get out of bed a couple days per week (*Id.*). Mr. Busse did not vacuum often, but tried to keep up with dishes and cleaned his bathroom once every month or two (R. 45). He purchased groceries about once a week (*Id.*). Additionally, Mr. Busse testified that while he isn't affected by road rage, he becomes impatient while driving (R. 46–47). Since

he stopped working, Mr. Busse has driven to and from Wisconsin about five or six times per year to see his uncle and best friend (R. 44). These trips took a little over four hours each way (*Id.*).

Mr. Busse estimated that in the month prior to the hearing he had two to three "bad days" per week, and he would sleep through these "bad days" (R. 51).[6] Furthermore, Mr. Busse stated that he had days where he lost his temper and struggled with deep-seated anger and issues with authority figures stemming from physical abuse he suffered as a child (R. 52). Mr. Busse testified that he took "anger management" classes, which provided him with tools to work through bad days, but was still unable to comprehend his more deeply rooted anger issues (*Id.*). Additionally, he claimed he had panic attacks which were becoming increasingly frequent— about once per week (R. 50). The attacks could be brought on by having lists of tasks to complete (R. 51–52). They sometimes abated after a couple of minutes, but one attack lasted up to ten minutes (R. 50).

A vocational expert ("VE") also testified at the hearing. The ALJ presented the VE with a hypothetical individual of Mr. Busse's age and education who was only able to engage in brief and superficial contact with supervisors, co-workers, and the general public; was unable to maintain an assembly line or production pace employment, but could maintain the pace necessary for a more flexible paced employment; and needed an additional ten-minute break per week (R. 56–57). The VE stated that such individual could work as an inspector, industrial cleaner, or marker (R. 57–58).

---

[6] The ALJ initially asked Mr. Busse whether he had "bad days meaning where you really can't get up and do things" (R. 51), to which Mr. Busse replied that in January, he had about two to three such days each week (*Id.*). Mr. Busse's attorney then asked him to explain the difference between a "bad day" and a "typical day," and Mr. Busse testified that he would "sleep through a bad day" (*Id.*).

In a second hypothetical, the ALJ asked the VE to consider the same scenario but for an individual who also "lacks the ability to understand, remember and carry out detailed instructions because of moderate limitations in concentration but retains a sustained concentration necessary for simple work of routine type" (R. 58). The VE testified that the result remained unchanged (*Id.*). Finally, the ALJ added that the individual would miss four or more days of work per month (*Id.*). The VE testified that, since employer tolerances for absences are typically one or less per month, this would eliminate all employment options (*Id.*).

## III.

In her written opinion, the ALJ determined that Mr. Busse was not under a disability from his alleged onset date of July 13, 2011 through the date of the opinion, April 21, 2016 (R. 19). The ALJ employed the familiar five-step process (R. 20–29). At Step 1, the ALJ found Mr. Busse had not engaged in substantial gainful activity since July 13, 2011 (R. 21). At Step 2, the ALJ listed Mr. Busse's severe impairments as bipolar disorder, an anxiety disorder, a personality disorder, and ADHD (*Id.*). The ALJ reviewed the progress notes from Mr. Busse's two mental health treatment providers, Dr. Goldin-Mertdogan and Dr. Buhrt, and recognized that these progress notes illustrated that Mr. Busse's symptoms "wax and wane" (*Id.*). In particular, the ALJ explained that, at times, the notes indicated Mr. Busse had an improved mood, calm affect, better energy and motivation, and good attention, concentration, and memory (R. 21–22). At other times, the notes reflected he had poor energy, motivation, attention, and concentration, as well as racing thoughts and a frustrated mood (R. 22). The ALJ stated that Mr. Busse's ADHD was well controlled on Adderall (*Id.*).

At Step 3, the ALJ concluded that Mr. Busse's impairments, individually or in combination, did not meet or medically equal Listings 12.04, 12.06, or 12.08 under her

Paragraph B analysis (*Id.*).[7] The ALJ found that Mr. Busse had no restriction in activities of daily living because he was able to, among other things, maintain personal care, complete household chores, drive, run errands, visit a friend and do farm chores together, care for his pet cats, and travel to Wisconsin to help his uncle (*Id.*). However, the ALJ concluded that Mr. Busse had moderate difficulties in social functioning (*Id.*). Mr. Busse reportedly had a short fuse, did not get along well with others due to his anger, had become increasingly reclusive, and did not handle stress or changes in routine well (*Id.*). The ALJ suggested these reports were inconsistent with other areas in the record where Mr. Busse was described as calm, relaxed, cooperative, engaging, pleasant, with good eye contact, and capable of visiting family in Wisconsin and maintaining contact with his daughter (*Id.*).

The ALJ found Mr. Busse had moderate difficulties regarding concentration, persistence, or pace based on similar inconsistencies in the record (R. 23). Mr. Busse reported that he was able to follow simple instructions, but did not finish what he started and had difficulty managing simple tasks and following instructions (*Id.*). Yet the ALJ noted that the psychiatric progress notes, particularly the August 2013 consultative psychological evaluation conducted by Dr. NieKamp, often showed Mr. Busse's attention and concentration were good (*Id.*). The ALJ found it curious that Dr. NieKamp indicated that Mr. Busse's cognition was appropriate but "inexplicably gave the claimant a rather low [GAF] score of 45" (*Id.*). Indeed, the ALJ found Mr.

---

[7] The ALJ found that neither the Paragraph B nor Paragraph C Criteria were met (R. 22–24). *See Martin v. Colvin*, No. 14-C-9048, 2016 WL 1664907, at *7 (N.D. Ill. Apr. 25, 2016) (citing 20 C.F.R. § 404) ("Paragraph B requires medical findings supporting at least two of the following: (a) marked impairment in age-appropriate cognitive/communicative function; (b) marked impairment in age-appropriate social functioning; (c) marked impairment in age-appropriate personal functioning; or (d) marked difficulties in maintaining concentration, persistence, or pace."); *Decker v. Colvin*, No. 13-C-1732, 2014 WL 6612886, at *6 n.12 (N.D. Ill. Nov. 18, 2014) (citing http:// www.ssa.gov/disability/professionals/bluebook/12.00–MentalDisordersAdult.htm#12_07 (last visited on October 31, 2014)) ("Under Paragraph C, there must be evidence of episodes of decompensation for extended duration and evidence that even a minimal increase in mental demands or change in the environment could cause the individual to decompensate.").

Busse's performance at the August 2013 evaluation similar to his performance at the April 2014 evaluation conducted by Dr. Wurglitz, but noted that Dr. Wurglitz assigned a much higher GAF score of 65 (*Id.*). Mr. Busse had experienced no episodes of decompensation of extended duration (*Id.*).

The ALJ then determined that Mr. Busse had the RFC to perform a full range of work at all exertional levels, but had non-exertional limitations resulting from his mental impairments (R. 24). Specifically, because of Mr. Busse's moderate limitations in social functioning, he could only have brief and superficial contact with coworkers, supervisors, and the general public (*Id.*). Furthermore, given his moderate limitations in pace, Mr. Busse would be unable to maintain assembly line or production pace employment but could sustain the requisite pace for more flexible employment options (*Id.*). The ALJ concluded that Mr. Busse must be allowed to take one additional ten-minute break per week (*Id.*).

The ALJ determined that Mr. Busse's description of the intensity and limiting effects of his symptoms was not entirely consistent with the record (R. 25). For instance, the ALJ noted that Mr. Busse reported performing various daily activities (*Id.*). Additionally, the ALJ pointed to Mr. Busse's testimony that he had panic attacks lasting up to ten minutes once per week, despite the fact that Dr. Goldin-Mertdogan's progress notes did not reflect increasingly frequent or prolonged panic attacks (*Id.*). The ALJ included an additional ten-minute break in Mr. Busse's RFC, allowing him to remove himself from a stressful situation and take a restroom break (*Id.*). Finally, the ALJ stated that there was nothing in the record suggesting that Mr. Busse's temper would be triggered in "brief and superficial" situations (*Id.*). In determining Mr. Busse's RFC, the ALJ found his allegations consistent with the evidence indicating that Mr. Busse was subject

to a degree of functional limitation during the relevant time period, and reduced his RFC accordingly (*Id.*).

The ALJ gave "no weight" to Dr. Goldin-Mertdogan's March 10, 2014 opinion and "very little weight" to his July 13, 2015 opinion that Mr. Busse would have bad days that would cause him to miss more than three days of work per month (R. 26). The ALJ gave the March 10, 2014 impairment questionnaire "no weight" because he found it inconsistent with: (a) the fact that Dr. Goldin-Mertdogan listed multiple symptoms on the March 10, 2014 impairment questionnaire but did not include recurrent panic attacks or hostility and irritability; and (b) Dr. Goldin-Mertdogan's statement that Mr. Busse's symptoms are repeated and severe without treatment, despite the evidence that Mr. Busse received ongoing treatment and responded positively and had only intermittent symptomology (*Id.*).

The ALJ gave the July 2015 impairment questionnaire "very little weight" because she found it inconsistent with multiple treatment records indicating signs of improvement (*Id.*). The ALJ pointed to an April 27, 2011 letter in which Dr. Goldin-Mertdogan stated that Mr. Busse "showed improvement in his mood, he was better able to control his anger and think more positively after taking anger management classes, and he was ready to return to work on a full time basis" (*Id.*). Additionally, the ALJ noted that Dr. Goldin-Mertdogan's January 14, 2011 treatment notes included a positive report by Mr. Busse that he "enjoyed not working," and Dr. Goldin-Mertdogan observed "he had good energy, no panic attacks, and his memory, attention, [and] concentration were all good. He had fair insight and fair judgment; his ADHD symptoms were under control" (*Id.*). The ALJ cited visits from June 13, 2014, August 8, 2014, and October 2015, during which Dr. Goldin-Mertdogan observed that Mr. Busse's attention and concentration were within normal limits, his memory was intact, and he had a "cooperative and pleasant"

attitude (R. 26–27). During the August 2014 visit, Mr. Busse also reported that he was "somewhat less depressed" (R. 26). Finally, the ALJ noted that in July 2015, Mr. Busse spent time with his daughter and neighbors (R. 27).

The ALJ found that Mr. Busse's self-reports and Dr. Goldin-Mertdogan's assessments contradicted the marked limitations stated by Dr. Goldin-Mertdogan in his RFC determination (*Id.*). Specifically, the ALJ was "not convinced that the claimant's mental impairments would result in marked limitations or excessive absenteeism out of medical necessity" (*Id.*). In addition, the ALJ noted that Mr. Busse's statements about his financial problems, lack of motivation to work, and dislike for his boss at Caterpillar were "not necessarily correlated with mental illness or a valid reason to provide disability income" (*Id.*). Finally, the ALJ noted that the brief statement Dr. Goldin-Mertdogan made on May 10, 2014—indicating that Mr. Busse was "unable to work" due to a bipolar disorder and ADHD—was an improper legal conclusion reserved to the Commissioner (R. 26).

As with Dr. Goldin-Mertdogan's opinion, the ALJ afforded "little weight" to Dr. Buhrt's opinion that Mr. Busse would likely be absent from work more than three times per month (R. 27). The ALJ found the opinion contradicted by the following: (a) on May 15, 2015, Dr. Buhrt indicated that Mr. Busse was having legal and financial troubles, but did not indicate that he was irritable, hostile, or having recurrent panic attacks; and (b) although Dr. Buhrt reported that Mr. Busse had a number of marked limitations, "interestingly, he indicated that the claimant has no more than mild limitations in interacting appropriately with the public and in maintaining socially appropriate behavior" (*Id.*). In addition, the ALJ noted that Mr. Busse was planning to visit family in Wisconsin in August 2014, and that Dr. Buhrt observed Mr. Busse to be

"cooperative, engaging, friendly, he made good eye contact, he had normal attention, focus, and activity levels, and the claimant's behavior was appropriate" in August 2015 (*Id.*).

However, the ALJ gave "great weight" to one narrow point offered by Dr. Buhrt (*Id.*). In a September 27, 2015 letter, Dr. Buhrt opined that Mr. Busse would "likely experience a serious decline in emotional and physical health and the loss of the position" if Mr. Busse obtained new employment (*Id.*). Dr. Buhrt noted that Mr. Busse experiences "tremendous frustration and anger" even with changes in his work environment (*Id.*). The ALJ stated that, although Dr. Buhrt "did not provide specific vocationally relevant limitations," she gave great weight "as to the information presented" (*Id.*). Nonetheless, the ALJ was unconvinced that the symptoms triggered at Mr. Busse's last job would arise in a slower paced environment with only brief and superficial contact with coworkers (*Id.*). The ALJ reiterated that Mr. Busse's financial and legal problems are not necessarily indicative of mental illness (*Id.*).

The ALJ gave only "some weight" to the opinions of the non-examining state agency medical consultants, noting that new probative evidence about Mr. Busse's potential for anger was received after the opinions were rendered (R. 25). However, the ALJ gave "significant weight" to the opinions of the non-examining state agency physicians, especially those concerning Mr. Busse's limited interaction with others (R. 28, 92). The ALJ noted that additional restrictions were warranted based on Mr. Busse's prior issues maintaining the requisite pace for a factory setting and his challenges with panic attacks (*Id.*).

Ultimately, the ALJ concluded that Mr. Busse was unable to perform his past relevant work, but that jobs existed in significant numbers in the national economy that he could perform (R. 28–29). The ALJ thus concluded that Mr. Busse was not disabled (R. 29).

## IV.

This court reviews an ALJ's decision to determine whether it is supported by substantial evidence. *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017) (quoting *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001)). "Our review is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers*, 864 F.3d at 526. However, the ALJ's decision "must be based on testimony and medical evidence in the record, . . . [and] must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (1996).

Mr. Busse alleges the ALJ erred by failing to properly weigh the medical opinion evidence, including giving little or no weight to Mr. Busse's treating psychiatrist, Dr. Goldin-Mertdogan, and treating psychologist, Dr. Buhrt (doc. # 11: Pl.'s Mot. for Summ. J., at 13). Additionally, Mr. Busse alleges the ALJ did not properly evaluate his testimony (*Id.* at 16). For the reasons that follow, we find that the ALJ erred by inadequately supporting her decision to give little to no weight to the medical opinions of Dr. Goldin-Mertdogan and Dr. Buhrt, and by substituting her judgment for that of the independent medical findings. We agree this error warrants remand, and thus need not reach Mr. Busse's additional claim.

## V.

A treating physician's opinion "regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Brown v. Colvin*, 845 F.3d 247 (2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)). An ALJ must provide "good reasons" for

declining to give controlling weight to a claimant's treating physician's opinion. 20 C.F.R. § 404.1527(c)(2) (2017). Even if the ALJ provides good reasons for refusing to give a treating physician's opinion controlling weight, the regulation requires the ALJ to determine the appropriate weight due based on "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); *Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018).

Here, we conclude that the ALJ erred by improperly weighing the medical evidence and making independent findings in its absence. We first discuss the ALJ's weighing of Dr. Goldin-Mertdogan's opinions and reports.

At the outset, we disagree that the ALJ had the "good reasons" required under 20 C.F.R. § 404.1527(c)(2) for refusing to give Dr. Goldin-Mertdogan's opinions controlling weight. The only reason the ALJ provided for giving less than controlling weight to Dr. Goldin-Mertdogan's opinions was that she perceived them to be inconsistent with his treatment records (R. 26–27). However, contrary to the ALJ's statement, Dr. Goldin-Mertdogan's March 2014 impairment questionnaire did in fact include "hostility and irritability" among the many clinical findings supporting his diagnosis (R. 509).

Additionally, the ALJ cited Mr. Busse's "good response" and "intermittent symptomology" as incompatible with an opinion that he would also experience "bad days" that would require him to miss work more than three times a month (R. 26). This claimed discrepancy led the ALJ to give Dr. Goldin-Mertdogan's March 2014 opinion no weight (*Id.*). However, the ALJ cited no medical evidence to support the claim that a good response and intermittent symptoms are incompatible with someone diagnosed with bipolar disorder, ADHD,

and other personality disorders having bad days that would cause him to miss more than three work days per month. "There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce. Moreover, the ALJ's analysis reveals an all-too-common misunderstanding of mental illness." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). The nature of bipolar disorder is that people so afflicted "experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." *Id.*; *see also Larson*, 615 F.3d at 751 (quoting *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)) ("[S]ymptoms that 'wax and wane' are not inconsistent with a diagnosis of recurrent, major depression. 'A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days.'"). The ALJ violated *Rohan*'s prohibition on independently making medical findings by deciding on her own that because Mr. Busse showed a good response to treatment and intermittent symptomology, he could not be disabled or unable to work. 98 F.3d at 970.

The ALJ also erred when she gave "very little weight" to Dr. Goldin-Mertdogan's opinions in his July 2015 mental impairment questionnaire (*Id.*). Once again, the ALJ stated that Dr. Goldin-Mertdogan's opinions that Mr. Busse had marked limitations and would be absent from work more than three days per month were contrary to the doctor's treatment records (*Id.*). The ALJ then listed notes from a series of Mr. Busse's visits with Dr. Goldin-Mertdogan to demonstrate his lack of marked limitations or likelihood of absenteeism from a full-time job (*Id.*). These visits include April 2011, June and August 2014, and July and October 2015 (R. 26–27). However, "[a]n ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence." *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016). "This 'cherry-

picking' is especially problematic where mental illness is at issue, for 'a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition.'" *Id.* (quoting *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011)) (alteration in original).

The treatment notes the ALJ cited as incompatible with more than three bad days per month include only the positive annotations contained within, such as good attention and concentration, intact memory, and even that Mr. Busse "had spent time with his daughter and with neighbors" (R. 26–27). However, these same treatment reports contain other notes as well, which are markedly less positive—and, indeed, many that are negative. For example, Dr. Goldin-Mertdogan noted on June 13, 2014 that Mr. Busse's mood was "stated as anxious and depressed; overly emotional" and that his affect appeared "blunted; dysphoric" (R. 536). Additionally, while Mr. Busse reported no violent ideations, he also reported passive suicidal thoughts during the visit (*Id.*). The ALJ omitted other negative information from the same visits from which she provides the positive reports, including blunted affect (August 2014; R. 538), anxious mood (July 2015; R. 545), "tense and constricted" affect (*Id.*), "anxious and down" mood (October 2015; R. 597), and again blunted affect (*Id.*). This cherry-picking also extends to the failure to address reports during the relevant timeframe. For example, on March 1, 2013, Dr. Goldin-Mertdogan noted increased insomnia, more depression, worse mood, blunted affect, and poor energy level (R. 386).

Mr. Busse's own subjective account of his symptoms throughout his treatment deserves some consideration as well. *See Gerstner*, 879 F.3d at 262 ("[A]ll findings in psychiatric notes must be considered, even if they were based on the patient's own account of [his] mental symptoms."). The ALJ demonstrated the same tendency to include Mr. Busse's positive self-

reports—through choosing an April 2011 report, which is prior to his alleged onset date—while overlooking the trove of negative self-reports throughout the record. The ALJ thus erred by cherry-picking and highlighting the positive notes from certain visits, then using them to conclude that they were incompatible with Dr. Goldin-Mertdogan's opinion that Mr. Busse had marked limitations that would require more than three days of work absence per month (R. 26).

Moreover, even assuming inconsistency with treatment records was a "good reason" for refusing to give Dr. Goldin-Mertdogan's opinions controlling weight, the ALJ nevertheless erred by assigning his opinions little or no weight without considering the required regulatory factors under 20 C.F.R. § 404.1527(c), such as: neglecting to consider the length, nature, and extent of Dr. Goldin-Mertdogan's regular treatment over nearly a decade with Mr. Busse; explanatory support for the opinion; and the doctor's specialty as a psychiatrist. *Gerstner*, 879 F.3d at 263. Instead, the ALJ focused almost exclusively on one factor: a perceived inconsistency between Dr. Goldin-Mertdogan's opinions and the treatment records (R. 26). The regulation requires more, and that failure adds a second ground for remand.

The ALJ committed similar errors with respect to Dr. Buhrt's opinion that Mr. Busse would be absent from work more than three days per month by both cherry picking and independently making medical findings. For example, contrary to the ALJ's positive characterization of Dr. Buhrt's treatment notes, the exhibits she cites consistently state that Mr. Busse's mood was depressed, irritated, sad, and/or worried with his affect typically dysphoric or anxious (R. 553–57, 559–83). Some state that Dr. Buhrt observed Mr. Busse to be "severely depressed" (573–75). In fact, only one record within the set of notes cited by the ALJ stated that Mr. Busse was "O.K.," but even in that report Dr. Buhrt noted that Mr. Busse's "depressed mood" had worsened (R. 558). As was the case above with Dr. Goldin-Mertdogan, the ALJ has

cherry-picked the good and left out the bad in Dr. Burht's reports, which is not allowed. *Meuser*, 838 F.3d at 912; *Gerstner*, 879 F.3d at 262.

The lack of weight the ALJ assigned to both of Mr. Busse's treating doctors then left an "evidentiary deficit," which the ALJ simply filled with her opinion as to Mr. Busse's capabilities in potential jobs with less stress than he faced at Caterpillar. *Suide v. Astrue*, 371 Fed. App'x 684, 690 (7th Cir. 2010). The ALJ erred both by (a) improperly weighing the medical evidence, and (b) making independent findings in its absence.

## CONCLUSION

For the reasons stated above, we grant Mr. Busse' motion for summary judgment (docs. #10: Pl.'s Mot. for Summ. J., #11: Mem. in Support) and deny the Commissioner's motion (doc. #18). We remand the case for further proceedings consistent with this opinion. This case is terminated.

**ENTER:**

SIDNEY I. SCHENKIER
United States Magistrate Judge

**DATE: May 2, 2018**